ILHC OF EAGAN, LLC, d/b/a
The Commons on Marice,
petitioner, Respondent,

v.

COUNTY OF DAKOTA, Relator.

No. A03–1407.

Supreme Court of Minnesota.

March 17, 2005.

James C. Backstrom, Dakota County Attorney, Suzanne W. Schrader, Assistant County Attorney, Hastings, MN, for Relator.

Jeffrey J. McNaught, Jonathan P. Scholl, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Intergenerational Living and Health Care (ILHC) operates "The Commons on Marice" (The Commons), a senior assisted living community facility in Eagan, Minnesota. In 2001 and 2002, ILHC applied for a partial property tax exemption for The Commons under Minn.Stat. § 272.02, subd. 26 (2002) (repealed 2003). Dakota County denied ILHC's applications on the ground that The Commons was not eligible for the exemption. ILHC sought review of these denials. The Minnesota Tax Court concluded The Commons was eligible for the exemption and granted summary judgment in favor of ILHC. The county petitioned for a writ of certiorari. We reverse.

ILHC completed construction of The Commons in 1999. The county classified the property as "Apartment with Nursing Facilities." In April 2001, and again in March 2002, ILHC applied for a partial property tax exemption under Minn.Stat. § 272.02, subd. 26 (2002) (repealed 2003).[1]

---

1. Minnesota Statutes § 272.02, subd. 26, provided that:

A structure that is situated on real property is exempt if it is used for:

(i) housing for the elderly or for low- and moderate-income families as defined in Title II of the National Housing Act, as amended through December 31, 1990, and funded by a direct federal loan or federally insured loan made pursuant to Title II of the act; or

(ii) housing lower income families or elderly or handicapped persons, as defined in Section 8 of the United States Housing Act of 1937, as amended.

In order for a structure to be exempt under item (i) or (ii), it must also meet each of the following criteria:

(A) is owned by an entity which is operated as a nonprofit corporation organized under chapter 317A;

(B) is owned by an entity which has not entered into a housing assistance payments contract under Section 8 of the United States Housing Act of 1937, or, if the entity which owns the structure has entered into a housing assistance payments contract under Section 8 of the United States Housing Act of 1937, the contract provides assis-

The county denied ILHC's applications. ILHC paid the disputed taxes and filed petitions for review of the real estate taxes due and payable in 2001 and 2002.

In June and December 2002, ILHC and the county filed cross-motions with the tax court for partial summary judgment on the interpretation of two provisions of subdivision 26—romanette (ii) and subpart (D). The parties stipulated that The Commons met all of subdivision 26's requirements except for the two that specifically focused on a disputed interpretation of the statute: whether subpart (D) limited the exemption to housing that existed and was unassessed before the 1991 tax levy and whether romanette (ii) limited the exemption to housing for low-income residents. ILHC's position is that, to be eligible for the partial exemption, housing did not have to exist in 1991 and did not have to be for low-income elderly. The county takes a contrary position, asserting that the exemption was only for low-income housing that was in existence and unassessed before the 1991 tax levy. The county contends that the statute was intended for the narrow remedial purpose of assisting developments for low-income tenants who were faced with a sudden increase in taxes because the facilities had not been assessed prior to 1991 through no fault of the property owners.

To support its position that The Commons was ineligible for the exemption, the county submitted a newspaper article from January 1993 describing the background and tax circumstances of Central Towers, an apartment building for low-income elderly and disabled tenants in downtown Saint Paul.[2] It was and remains the county's contention that subdivision 26 was not applicable to The Commons because the subdivision was enacted as a specific remedy for Central Towers and other facilities faced with similar circumstances. According to the article, Central Presbyterian Church opened Central Towers in 1965 to house as many as 280 low-income elderly or mentally or physically handicapped tenants. Monthly rents included meal services and many of the residents received some type of government housing subsidy. Central Towers did not qualify for a property tax exemption as a charitable organization because its owners received the rental income.

At some point, a nonprofit corporation was formed to take over Central Towers. The newspaper article noted that the Central Towers building was not assessed real property taxes until 1991 when Ramsey County decided that it should not be exempt. This change and the resultant property taxes on the building led to the nonprofit corporation nearly depleting its cash reserve and increasing rents. In the article, the president of the corporation's board is attributed as indicating that the board would "ask the state Legislature to change the tax laws during the upcoming session to make the apartment building

tance for less than 90 percent of the dwelling units in the structure, excluding dwelling units intended for management or maintenance personnel;

 (C) operates an on-site congregate dining program in which participation by residents is mandatory, and provides assisted living or similar social and physical support services for residents; and

 (D) was not assessed and did not pay tax under chapter 273 prior to the 1991 levy,

while meeting the other conditions of this subdivision.

An exemption under this subdivision remains in effect for taxes levied in each year or partial year of the term of its permanent financing.

2. The article is from an unidentified newspaper. The county represents that it obtained the article from the Ramsey County Assessor's files.

and others like it exempt from local property taxes."

The county also submitted a partial transcript and tape recording of an April 19, 1993 meeting of the Minnesota Senate Property Tax Subcommittee where the property tax provisions of an omnibus tax bill were presented—including what became subdivision 26. After describing the criteria for exemption, a committee staff person stated, "These properties will be exempt from the property tax henceforth[;] due to an assessor's misinterpretation, they had been treated * * * as tax exempt in the past, and they will continue to be tax exempt under this language in the future." (Brackets added.)

The tax court's own research identified two additional instances where legislators made statements concerning the provision that eventually became subdivision 26. The first statement was during an April 29, 1993 meeting of the Conference Committee on Taxes held to consider enactment of the subdivision that is now codified as Minn.Stat. § 272.02, subd. 26. The relevant excerpt is as follows:

> Sen. Johnson [3]: Do you want to know where [the provision] comes from?
>
> Sen. [Flynn]: As I recall, it was [Senator Pappas] who found out that there was some senior housing that had not been assessed in the past, and it was determined suddenly that it should be [taxed] * * * and, whereas this kind of housing had not been subject to property tax, nor has it been assessed in other parts of the metropolitan area * * * that we are able to identify * * *.
>
> Q: Senator, how many properties will this apply to?
>
> Sen. [Flynn]: Just one or two * * *.

[Voice in background]: "One * * * [in] Senator [Pappas's] district * * * St. Paul * * * Central Towers."

The second statement identified by the tax court was from a May 17, 1993, proceeding of the House of Representatives:

> Q: [Representative (Perlt)]: What does this Bill do for the City of Saint Paul?
>
> A: [a Tax Committee (member)]: This Bill has a number of provisions that were endorsed and advocated for by Saint Paul and its legislative delegations. Number one, the local option sales tax; special assessment language is there; there is a provision for Central Towers; there is a provision that will affect Ramsey County Assessor; there is Mariani's bill for housing * * *.

The county submitted three additional items that it claimed supported its interpretation of subdivision 26: the Minnesota Department of Revenue's October 2000 publication titled "Elderly Assisted Living Care Facility Bulletin" (Bulletin), and two affidavits, one by a Minnesota Department of Revenue appraisal supervisor and the other by a Minnesota Department of Revenue attorney.

The Bulletin states its purpose is to give assessors "a workable blueprint" to apply to elderly assisted living care facilities statewide. It does not specifically refer to Minn.Stat. § 272.02, subd. 26, but it explains that living facilities for the elderly will generally not be tax exempt unless they also qualify as public charities. The Bulletin specifically states:

> Since elderly assisted living care facilities are not exempted by any specific

---

**3.** The tax court's transcription does not indicate which Senator Johnson was speaking. During the 1993 legislative session, there were three senators in the Minnesota Senate with the surname "Johnson." It was likely that the speaker was Sen. Douglas Johnson, who was Chair of the Senate Taxes and Tax Law Committee.

statute, they can only be exempt if they meet the requirements for one of the general exemption provisions. The most probable potential for exemption for elderly assisted living facilities would be to qualify as an institution of purely public charity (Minnesota Statutes, section 272.02, subd. 7).

The Bulletin then discusses the application of factors we developed in *North Star Research Inst. v. County of Hennepin,* 306 Minn. 1, 236 N.W.2d 754 (1975), to determine whether an institution is one of "purely public charity."

The appraisal supervisor's affidavit primarily relates his understanding of the circumstances surrounding the enactment of the statute. These circumstances start with the discovery, in "1990 or 1991," that Central Towers was missing from the tax rolls. After this discovery, the supervisor believes Central Towers was assessed "for one or more years as omitted property pursuant to Minn.Stat. § 273.02." The supervisor's understanding is that the owners of Central Towers "protested the property tax to the legislature" and argued that the increase in rent caused by real estate taxes would force most of their tenants out of their homes. The supervisor then states that "[d]ue to the extremely unusual circumstances concerning Central Towers, legislation was drafted very narrowly to cover a property that *'was not assessed and did not pay tax under chapter 273 prior to the 1991 levy, while meeting the other conditions of this subdivision.'*" (emphasis in original). The supervisor adds that he has heard of only one other property that was exempted under subdivision 26 since its enactment.

The Department of Revenue attorney states in his affidavit that the department's "long-standing" interpretation of subdivision 26 is that "it requires that the particular facilities existed prior to the 1991 levy,

and yet at the same time, they must not have been assessed prior to the 1991 levy." The attorney notes that since subdivision 26 was enacted, he recalls two instances where a property was denied exemption. One of these instances involved a building in Anoka County that was denied an exemption because, even though it existed prior to the 1991 levy, it did not comply with clauses (A) through (C) prior to the levy. The other instance involved a building in Crow Wing County that did not qualify for an exemption because it did not exist prior to the 1991 levy. Attached to the affidavit is a copy of the text of a July 15, 1996 letter from the department's attorney to the Crow Wing County Assessor. In this letter, the attorney explained that "one requirement" of the statute was that "the property must have been in existence prior to the 1991 assessment date."

To counter the county's arguments, ILHC submitted affidavits documenting two exemptions under subdivision 26 granted to facilities in Washington and Hennepin Counties. The Washington County facility, located in Oakdale, had been constructed in 1997–98 and received a real estate tax exemption under the statute for taxes payable in the years 1998 through 2002. That exemption, however, has since been revoked. ILHC's attorney reported by affidavit that the exempt facility in Hennepin County had been constructed in 1968. The affidavit noted that the Hennepin County facility received the tax exemption in the late 1990's, but that Hennepin County had notified the owners of that facility that, beginning with the 2003 assessment, it would no longer qualify for the exemption under subdivision 26 because its permanent financing expired in November 2002.

The tax court ruled in favor of ILHC on both cross-motions for partial summary judgment. The court held that romanette

(ii) and subpart (D) did not limit eligibility to facilities housing low-income residents or to those in existence before 1991. The county requested permission to move for reconsideration and submitted evidence that the legislature repealed subdivision 26 during its 2003 special session. The court denied the county's request for reconsideration. We granted the county's subsequent petition for certiorari.

## I.

We first consider the interpretation of Minn.Stat. § 272.02, subd. 26(D). Subdivision 26 was enacted in 1993,[4] but was later repealed during the legislature's 2003 special session. Act of June 8, 2003, ch. 21, art. 4, § 13(a), 2003 Minn. Laws 2467, 2483. Subpart (D) of Minn.Stat. § 272.02, subd. 26, provided:

> In order for a structure to be exempt under item (i) or (ii), it must also meet each of the following criteria:
>
> \* \* \* \*
>
> (D) was not assessed and did not pay tax under chapter 273 prior to the 1991 levy, while meeting the other conditions of this subdivision.

The dispute over the interpretation of subpart (D) centers on the meaning and role of the word "while" in the context of the subdivision. ILHC suggests that subpart (D) is unambiguous and that "while" expresses a conditional relationship requiring only that "*if* a structure existed prior to the 1991 levy, it must not have been assessed or paid tax under Chapter 273 but still met the remaining conditions of the statute." (emphasis added). In short, ILHC's position is that subpart (D) does not require a structure to have been in existence before the 1991 tax levy. Rath-

er, ILHC asserts that subpart (D) requires that a structure meet all of the subdivision's requirements only *if* it existed before 1991.

In contrast, the county argues that "while" means "at the same time" or "during the time that." The county asserts that under its definition a structure had to comply with subparts (A)-(C) *at the same time* that it was not assessed and taxes were not paid—i.e., assisted living services had to have been provided at the same time the structure was not assessed and taxes were not paid. Such compliance could happen only if the structure was in physical existence before the 1991 tax levy. The county also argues that under ILHC's interpretation the second half of subpart (D) would be redundant with another provision of the subdivision. Both parties use common dictionary definitions to support their respective positions.

Faced with essentially the same arguments on the meaning and role of the word "while," the tax court concluded that, because both meanings of "while" were based on common usage as evidenced by the dictionary definitions, subpart (D) was ambiguous. Having determined that subpart (D) was ambiguous, the court then attempted to ascertain the intent of the legislature in order to resolve the question whether subpart (D) excluded facilities not in physical existence before 1991.

 Claims that the tax court committed an error of law are subject to our review. Minn.Stat. § 271.10, subd. 1 (2004); *Homart Dev. Co. v. County of Hennepin*, 538 N.W.2d 907, 910 (Minn. 1995). Here, our review is based on the county's claim that the tax court errone-

---

4. Act of May 24, 1993, ch. 375, art. 5, § 3, 1993 Minn. Laws 2808, 2814, amended by Act of April 13, 1994, ch. 416, art. 1, § 9, 1994 Minn. Laws 111, 120, and codified at Minn. Stat. § 272.02, subd. 1, clause (25) (1994). It was later recodified at Minn.Stat. § 272.02, subd. 26 (2000).

ously interpreted Minn.Stat. § 272.02, subd. 26. We review the interpretation of statutes de novo. *A & H Vending Co. v. Comm'r of Revenue*, 608 N.W.2d 544, 547 (Minn.2000). When interpreting statutes that exempt property from taxation, we adhere to the proposition that "taxation is the general rule and exemption the exception." *Chateau Community Housing Ass'n, Inc. v. County of Hennepin*, 452 N.W.2d 240, 242 (Minn.1990). Moreover, "statutory provisions exempting property from taxation are to be strictly construed." *In re Raynolds' Estate*, 219 Minn. 449, 453, 18 N.W.2d 238, 240 (1945); *see also TCF Bank Sav. FSB v. Comm'r of Revenue*, 486 N.W.2d 756, 758 (Minn.1992).

■■■ The touchstone for statutory interpretation is the plain meaning of a statute's language. *See* Minn.Stat. § 645.16 (2004). When a statute's meaning is plain from its language as applied to the facts of the particular case, a judicial construction is not necessary. *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn.2001). Only if the statute is ambiguous do we apply the rules of statutory construction. *Correll v. Distinctive Dental Servs., P.A.*, 607 N.W.2d 440, 445 (Minn.2000). Under the basic canons of statutory construction, we are to construe words and phrases according to rules of grammar and according to their most natural and obvious usage unless it would be inconsistent with the manifest intent of the legislature. Minn.Stat. § 645.08(1) (2004); *see Homart*, 538 N.W.2d at 911. "[W]henever possible, no word, phrase, or sentence should be deemed superfluous, void, or insignificant."

*Owens v. Federated Mut. Implement & Hardware Ins. Co.*, 328 N.W.2d 162, 164 (Minn.1983); Minn.Stat. § 645.16.

■■■ Our rules of statutory construction also require us to read a particular provision in context with other provisions of the same statute in order to determine the meaning of the particular provision. *See Kachman v. Blosberg*, 251 Minn. 224, 229, 87 N.W.2d 687, 692 (1958). Moreover, "the legislature must be presumed to have understood the effect of its words and intended the entire statute to be effective and certain." *Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958); *see also* Minn.Stat. §§ 645.08, 645.16, 645.17(2). After juxtaposing the statute's language with our rules of statutory construction and the rules of grammar, we conclude that the tax court erred in its application of statutory canons of construction and in its determination of legislative intent to determine the meaning of subpart (D).

■■■ Any doubts as to this conclusion can be dispelled by examining subpart (D) using certain basic rules of grammar.[5] The word "while" is used in subpart (D) as a subordinating conjunction between the independent clause of "was not assessed and did not pay tax under chapter 273 prior to the 1991 levy" and the subordinate adverbial clause of "while meeting the other conditions of this subdivision"—with both clauses taking the subject of "the structure." The role of the subordinate clause is to modify the independent clause; thus, the issue with regard to the meaning

---

**5.** We recognize that the legislature may not have specifically focused on the rules of grammar when drafting this legislation. Nevertheless, grammar is a complementary analytical tool for understanding how language is used to convey meaning. *See State v. Flynn*, 123 N.H. 457, 464 A.2d 268, 271 (1983) (stating "Although the legislature is not compelled to follow technical rules of grammar and composition, a widely accepted method of statutory construction is to read and examine the text of the statute and draw inferences concerning its meaning from its composition and structure.") (citing 2A Sutherland Statutes and Statutory Construction § 47.01, at 70 (Sands ed.1973)).

of "while" is properly framed as how the "while" clause modifies the "was not *assessed* and did not *pay* tax" clause. Once this relationship is clarified, the function of "while" is easier to discern. Here, the "while" subordinate clause functions as an adverbial clause modifying the verbs "assessed" and "pay." Adverbial clauses can express the following relationships: time, place, manner, purpose, result, condition, reason, cause, or contrast. William Sabin, *The Gregg Reference Manual* 517 (8th ed.1996). Only two of these relationships appear to be indicated by the legislature's use of the "while" clause in subpart (D): time or condition.

The legislature's use of language within subpart (D) indicates that the "while" clause establishes a time relationship. Subparts (A)-(C) are all phrased in the present tense, but subpart (D)'s tense structure is complex, using multiple tenses. In the subpart's independent clause, the legislature used the past tense—i.e., "was not assessed," and "did not pay"— but in the modifying subordinate clause it chose to use the present tense—"meeting." This use of the present tense "meeting" emphasizes that a structure's conformance with subdivision 26's other conditions had to have occurred *during the time that* the structure "was not assessed and did not pay tax * * * prior to the 1991 levy." "[W]as not assessed and did not pay tax * * * prior to the 1991 levy" provides temporal grounding for subpart (D) and "while meeting the other conditions" situates the fulfillment of the "other conditions" as concurrent with not being assessed and not paying tax prior to the 1991 levy. To concurrently comply with the subdivision's other conditions, the structure had to physically exist because romanettes (i) and (ii) and subparts (A)-(C) all presuppose the physical existence of the structure. Therefore, we conclude the use of the "while" clause expressed a time relationship rather than a conditional relationship.

In determining which type of relationship the legislature established with its use of the "while" clause, we must also read the provision in context with the other provisions of subdivision 26. Subdivision 26 prefaces subparts (A)-(D) with the provision that the structure "must also meet each of the following criteria." The second clause of subpart (D) reads "while meeting the other conditions of this subdivision." ILHC's proffered plain language interpretation of subpart (D) gives meaning and effect to the second clause only in circumstances where a structure existed before 1991 and renders the clause superfluous for structures completed after the 1991 levy.[6]

Based upon the foregoing analysis, we conclude that giving full effect to every word in the statute shows that Minn. Stat. § 272.02, subd. 26(D), required a structure situated on real property to have been in existence before the 1991 tax levy to be eligible for a tax exemption. Therefore, we hold that the tax court erred when it found otherwise. The result of this holding is that The Commons was not eligible for exemption under subdivision 26(D); thus, it is unnecessary for us to consider the tax court's interpretation of subdivision 26(ii).

6. We recognize that there may also be a temporal aspect to ILHC's argument. This aspect involves an interpretation that the "while" clause does not establish a threshold for qualifying for the exemption, but only established when the condition of "was not assessed and did not pay tax" is to be applied. We conclude, however, that such a construction is in direct conflict with subdivision 26's explicit requirement that a structure "meet each of the following [four] criteria." (Emphasis added.)

## II.

Our conclusion that subdivision 26 applied only to structures in existence before 1991 does not end our analysis. ILHC contends in the alternative that if subdivision 26 applied only to structures in existence before 1991, it violated the Uniformity Clause of Article X, Section One of the Minnesota Constitution as well as the Equal Protection Clause of the United States Constitution's Fourteenth Amendment. In particular, ILHC argues that a 1991 cutoff for eligibility arbitrarily creates two classes among otherwise eligible structures: those in existence before the 1991 levy and those in existence after the 1991 levy. Because declaring subdivision 26 unconstitutional and striking it in its entirety would still result in a denial of ILHC's exemption, ILHC asks us to preserve subdivision 26's constitutionality by excising all or part of subpart (D) and allowing the rest of the subdivision to stand.

We review a statute's constitutionality de novo. *Westling v. County of Mille Lacs,* 581 N.W.2d 815, 819 (Minn. 1998). We presume statutes to be constitutional and exercise the power to declare a statute unconstitutional "with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989). "The party challenging the constitutionality of the statute bears the burden of establishing 'beyond a reasonable doubt' that the statute violates a constitutional right." *Westling,* 581 N.W.2d at 819 (quoting *In re Conservatorship of Foster,* 547 N.W.2d 81, 85 (Minn. 1996)). We have also noted that the complainant has the burden to show that "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Guilliams v. Comm'r of Revenue,* 299 N.W.2d 138, 141 n. 3

(Minn.1980) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). While we grant the same deference to the constitutionality of tax legislation as we give to other legislation, we have also stated that the legislature has a wide discretion in classifying property for purposes of taxation. *Contos v. Herbst,* 278 N.W.2d 732, 736 (Minn.1979).

The Uniformity Clause requires that "[t]axes shall be uniform upon the same class of subjects * * *." Minn. Const. art. X, § 1. The Uniformity Clause is no more restrictive on the legislature's power to tax or classify than the Equal Protection Clause and we use the same rational basis test in examining constitutionality under both clauses. *Westling,* 581 N.W.2d at 820. We articulated the three parts to this rational basis test in *Miller Brewing Co. v. State:*

> (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

284 N.W.2d 353, 356 (Minn.1979).

The first step in our inquiry is to determine whether the distinction based on a structure's existence before 1991 is "manifestly arbitrary and fanciful" rather than being "genuine and substantial, * * * providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs." *Id.* Generally, our re-

view is deferential and "[l]egislative classifications not based on a suspect class nor affecting fundamental interests * * * must be upheld under equal protection and uniformity clause analysis unless there is no reasonable basis for the classification." *Westling,* 581 N.W.2d at 820. The difference between classes need not be great, and if any reasonable distinction can be found, a court should sustain the classification. *In re McCannel,* 301 N.W.2d 910, 917 (Minn.1980).

We previously examined the rational basis of tax classifications in *In re McCannel.* In *McCannel,* the limited market value statute placed a 5 percent maximum valuation increase for property taxes, but only for residential properties that had been previously valued. *Id.* at 915. Nonresidential property and properties that had not been previously valued, i.e., new construction, could not benefit. *Id.* The statute was amended several times to, *inter alia,* raise the maximum valuation increase to 10 percent and include nonresidential properties. *Id.* None of the statutory caps was ever available to the taxpayers in *McCannel. Id.* The limited market value concept was eventually repealed. *Id.*

In *McCannel,* we rejected the taxpayers' contention that the statute violated the Uniformity Clause or Equal Protection Clause concluding that the statute had a rational basis. We explained:

> At a time of rapid inflation and periodic reassessments which were often unable to keep pace with rising property values, the limitation provision allowed significant increases in property taxes to be absorbed gradually by the taxpayer. Gradual implementation of significant tax increases promoted stability in ownership by giving property owners time to adjust to and make provisions for the increases rather than forcing some own-

ers to sell their property because of lack of funds to pay the taxes.

*Id.* at 918. We stated further that the taxpayer's arguments that the limitation provision protected only some taxpayers but not others who were not necessarily better able to pay higher property taxes "address[ed] the wisdom of the legislature's program, not its constitutionality." *Id.*

We conclude that aspects of the classification at issue here are analogous to the limited market value statute challenged in *McCannel.* Subdivision 26 appears to have been in response to the unusual situation and sudden tax increase confronted by Central Towers. The Central Towers building was in the presumably rare situation of having been inadvertently left off the tax rolls for 25 years until Ramsey County discovered the absence in 1991. Ramsey County's subsequent assessment of Central Towers and the required payment of taxes apparently affected the ability of the property's owners to offer affordable rents to tenants—tenants who were likely among the most vulnerable to losing their housing due to a rent increase.

Our review of the statute's history supports a conclusion that the statute was an effort to remedy the rare situation faced by Central Towers and any other similarly situated facilities. Minnesota Statutes § 272.02, subd. 26, allowed these properties that had not been assessed through any fault of the property owner to remain partially tax exempt if they continued to meet the statute's other requirements. The legislature recognized that the sudden increase in tax payments could harm the ability of these properties to provide low-income housing because the owners had not anticipated the sudden imposition of property taxes. The purpose was not to create a new exemption as ILHC contends, but to create a remedy for those

properties affected by Ramsey County's mistake.

We conclude that, in this context, subdivision 26's limitation of eligibility to structures that existed before 1991 is a genuine and natural distinction justified by the peculiar problem it was designed to remedy. In addressing this problem, the legislature drafted subdivision 26 to include all other facilities that also may have been in the position of Central Towers. At least one other building is reported to have qualified for the exemption.

The second prong of the rational basis test requires that the challenged classification be genuine or relevant to the purpose of the law. *Miller Brewing*, 284 N.W.2d at 356. Although the purpose of subdivision 26 is not explicitly stated, we have declared that "[i]n equal protection analysis, [any] conceivable and legitimate reason for the legislative classification may provide the rational basis to satisfy the constitutional requirement of equality and uniformity for tax legislation." *Brainerd Area Civic Center v. Comm'r of Revenue*, 499 N.W.2d 468, 472 (Minn.1993). The county asserts that the purpose of subdivision 26 was to preserve affordable housing for vulnerable populations by remedying the unusual circumstances faced by Central Towers and other similarly situated structures. The value of a structure—as opposed to the value of the land—may represent nearly all of a property's assessed value. By exempting the value of a qualified structure, subdivision 26 significantly lessened the property tax burden suddenly faced by Central Towers and other similar structures operated by nonprofit organizations serving populations in need of affordable housing, allowing those organizations to maintain affordable rents.

The legislature's requirement that a structure exist before 1991 as one of its criteria for exemption may appear to be imperfectly related to subdivision 26's purpose. Nevertheless, "imperfection is not a constitutional defect. It is only necessary that the classification be rationally related to the purpose. The wisdom and social effects of a statute lie within the secure domain of the legislature * * *." *Westling*, 581 N.W.2d at 822. It is well-established that "the legislature 'may implement (its) program step by step * * * adopting regulations that only partially ameliorate a perceived evil and referring complete elimination of the evil to future regulations.'" *Wegan v. Village of Lexington*, 309 N.W.2d 273, 283 (Minn.1981) (quoting *Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)). We conclude the classification in subpart (D) is relevant to the purposes of subdivision 26. The time cutoff at 1991 was reasonably related to the statute's remedial purpose of allowing the affected properties a partial exemption for reasonably unanticipated property tax increases.

The third and final prong of our rational basis test requires that "the purpose of the statute must be one that the state can legitimately attempt to achieve." *Miller Brewing*, 284 N.W.2d at 356. We conclude that protecting properties from a sudden unanticipated tax increase in order to preserve affordable housing is a legitimate governmental purpose.

ILHC contends that decisions by the United States Supreme Court and the Kansas Supreme Court in purportedly similar cases mandate a different outcome. ILHC first asserts that *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), warrants the conclusion that subpart (D) violates the Equal Protection Clause. ILHC's reliance on *Hooper* is misplaced. In *Hooper*, the Court invalidated a New Mexico partial property tax exemption enacted in 1983 for Vietnam veterans who

were New Mexico residents before May 8, 1976. *Id.* at 612, 105 S.Ct. 2862. The Court concluded that the resulting classification bore no rational relationship to the asserted goal of encouraging veterans to live in New Mexico because the retroactive legislation could not plausibly have encouraged veterans to move to the state. *Id.* at 619–20, 105 S.Ct. 2862. The Court also concluded that the other justification for the classification, that New Mexico wished to reward its veterans, was not rationally related because the statute was not written to require any connection between a veteran's prior residence and military service. *Id.* at 621, 105 S.Ct. 2862. Favoring established residents of a state over new residents is not a legitimate state purpose. *Id.* at 623, 105 S.Ct. 2862. Absent any reasonable justification, the New Mexico statute's discrimination between veterans based on their residency was impermissible. *Id.* at 622–23, 105 S.Ct. 2862. We conclude that the reasoning in *Hooper* does not apply here because, unlike the New Mexico statute, subdivision 26 has a legitimate remedial purpose.

ILHC's reliance on the Kansas Supreme Court's decision in *State v. Parrish*, 257 Kan. 294, 891 P.2d 445 (1995), is similarly misplaced. The statute found unconstitutional in *Parrish* allowed any personal property discovered to have been left off the tax rolls to be added back to the rolls, but added that "such property shall not be liable for any taxes that would have been levied against such property for any year prior to the 1992 tax year and no penalty shall be added." *Id.* at 447. The *Parrish* court held the Kansas statute violated the uniformity provision of the Kansas Consti-

tution. *Id.* at 457. Essential to the *Parrish* decision was that the Kansas statute conferred a retroactive benefit to taxpayers based on characteristics of the taxpayers rather than on the classification of the property. *Id.* at 457. The statute allowed tangible personal property owners to be divided into two classes: those who had paid their taxes on time and those who had not. *Id.* at 450. In essence, the Kansas statute rewarded those who had not correctly reported their personal property. *Id.* at 457.

We reached a similar conclusion to *Parrish* in *State ex rel. Matteson v. Luecke*, 194 Minn. 246, 260 N.W. 206 (1935). In *Matteson*, we struck down a statutory provision that forgave a portion of the taxes owed by delinquent taxpayers, concluding that the statute's classification of property owners—those who pay taxes promptly and those who do not—was not reasonable. *Id.* at 251, 260 N.W. at 208. But in *Matteson*, we suggested that there may be some forms of tax forgiveness that "might be valid under certain circumstances," such as those that were focused on the value of the property and on the owner's ability to pay. *Id.* at 253, 260 N.W. at 209.[7]

We conclude that the partial exemption contained in subdivision 26, which provided a partial exemption to structures left off the tax rolls through no fault of the property owners, is analogous to the type of tax forgiveness we suggested might be proper in *Matteson* and *Calhoun*. While we are troubled that Minn.Stat. § 272.02, subd. 26, did not phase in full taxation as applied to similarly situated properties (*see McCannel*, 301 N.W.2d at 918) or did not

---

7. While the case of *In re Calhoun Beach Holding Co.* is factually distinguishable from *Matteson* and the case before us, it is notable. 205 Minn. 582, 593, 287 N.W. 317, 323 (1939). In *Calhoun*, we upheld an order by the Minnesota Tax Commission granting a tax forgiveness application sought by the Calhoun Beach Holding Company because the abatement had been based on the taxpayer's ability to pay and the value of the property in question. *Id.* The City of Minneapolis had objected to the abatement, challenging it on Uniformity Clause grounds. *Id.*

contain a sunset provision limiting the application of the statute to a predetermined period of time, nonetheless, and importantly, the legislature did repeal subdivision 26 in 2003, thus, in effect, limiting the disparate effects of the remedy. *See McCannel,* 301 N.W.2d at 918–19. Moreover, Central Towers was not delinquent in paying its taxes, but rather it had not been assessed because of a government error. The partial exemption provided in subdivision 26 was rational because the sudden increase in taxes could enforce a hardship on these properties' ability to provide low-income housing. Finally, subdivision 26 used 1991 as a cutoff date, not to provide a retroactive benefit of forgiving past taxes, but only to set a benchmark to use in determining eligibility for a future exemption. Therefore, on these unique facts, we conclude that subdivision 26's partial exemption is constitutional.[8]

For the foregoing reasons, we reverse the tax court.

Reversed.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

8. As another alternative argument, ILHC contends that subdivision 26 violated the Minnesota Constitution's prohibition on special legislation found at Article XII, Section One. ILHC's special legislation argument is premised on a conclusion that the legislature intended subdivision 26 to exclusively benefit a single property—Central Towers. Because we reach no such conclusion, there is no basis for considering a special legislation argument as it is framed by ILHC. Our interpretation of the statute's plain language would not limit subdivision 26's benefits to any particular facility. A statute may be aimed at a specific remedial purpose without being aimed at one specific property.

The result in this case would not be changed even if we were to modify ILHC's special legislation argument to be that limiting exemption to a narrow class of pre–1991 facilities makes subdivision 26 special legislation. A classification limited to members of a class existing at the time of its enactment and not allowing additional members is still valid as long as the purpose is remedial and the statute is intended to address a temporary situation. *Thorpe Bros. v. Itasca County,* 171 Minn. 312, 315, 213 N.W. 914, 915 (1927).